UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| JAMES MINCKLER | CIVIL ACTION NO. 20-1173 |
| VERSUS | SECTION "G"      MAGISTRATE # 2 |
| WATERMAN STEAMSHIP CORPORATION AND SEABULK TOWING SERVICES, INC. | JUDGE NANNETTE JOLIVETTE BROWN |
| | MAGISTRATE JUDGE DONNA PHILLIPS CURRAULT |

**DEFENDANTS, WATERMAN STEAMSHIP CORPORATION'S AND SEABULK FLEET MANAGEMENT, LLC, TRIAL MEMORANDUM**

**NOW INTO COURT,** through undersigned counsel, come Defendants, Waterman Steamship Corporation and Seabulk Fleet Management, LLC, who submit the following Trial Memorandum:

**SUMMARY OF FACTS**

Plaintiff, Mr. James Minckler was a Bosun assigned to the M/V OCEAN GIANT, a heavy lift geared container ship, owned and operated by defendants. On the 1st of February, 2020, the vessel was delivering supplies to the U.S. Antarctic base at McMurdo Sound, Antarctica. Minckler had joined the vessel on October 24, 2019. On February 1, 2020, the vessel was alongside at McMurdo working cargo. Weather was not a factor. The vessel had arrived at McMurdo Station on the 22nd of January, 2020. Its cargo (mostly containers) was offloaded by the Navy cargo handling Battalion (NCHB-1) over the next several days. Thereafter, the NCHB-1 began loading containers onto the OCEAN GIANT. The date of the incident -- February 1, 2020 -- was the second to last day of cargo operations. At 05:24 cargo was stopped to reposition the hatch covers. The cargo holds had covers on them which could be opened and closed by a hydraulic system. The covers on the #2 cargo hold needed to be repositioned to allow more accessibility to the hold.

{N4531670.1}

1

During this repositioning, hatch leaf #6 had to be placed in its stowed position. While attempting to do this, the vessel crew was unable to properly seat the hatch leaf for an unknown reason. The Second Mate radioed the Chief Mate to inform him of the problem. The Chief Mate left his office to join the crew and troubleshoot the problem. The Bosun (Plaintiff) had recently come on duty and the Second Mate asked that he assist in trying to identify the reason the hatch leaf was not properly seating. Various reasons were discussed including possible ice buildup. It was decided that the hatch leaf would be raised (about 6-8 inches) and the Chief Mate and Bosun would try to find the obstruction. The Second Mate operated the hydraulic levers to raise the hatch leaf and the Chief Mate and Bosun began inspecting the rails under the hatch leaf for obstructions. The Bosun saw a bridge fitting (a 6" piece of metal) stuck on the rail under the hatch leaf. The Chief Mate went to get a metal bar to knock it loose, but before he returned, the Bosun had stuck his hand under the hatch leaf to grab the fitting. The hatch leaf began to lower on its own and caught the Bosun's hand. The Chief Mate radioed the Second Mate to go up on the hatch leaf, at which time the Bosun's hand was freed. The Bosun was taken to the hospital at McMurdo Station for emergency treatment. He was later transferred to Christchurch Hospital in New Zealand where he was treated for about three weeks before being repatriated to the Philippines. The Bosun is an American citizen living in the Philippines with his fiancé and their five children.

1. **Evidentiary Issues**

Defendants are not aware of any potential evidentiary issues to be dealt with at the upcoming trial.

## 2. Liability

While defendants acknowledge that their investigation noted certain actions by defendants that were contributory causes of the accident, the overriding cause was Minckler placing his hand into a known pinch point. Minckler claims he was unaware that the hatch leaf was a pinch point. However, the evidence will show that plaintiff was an 18 year experienced Bosun who had been working on the OCEAN GIANT for over three months. Regardless of whether he was aware of problems with the hydraulics of the #6 hatch leaf, the hatch cover was an obvious pinch point.

## 3. Post Accident Medical Care

Following his release from Christchurch Hospital in New Zealand in February 2020, Minckler traveled home to the Philippines. It is undisputed that plaintiff, in the two years since the accident and his treatment in New Zealand, has never sought medical treatment. He claims that COVID had resulted in all medical facilities being shut down and that this is the reason he has never sought medical care. This may have been true temporarily in 2020 but certainly not in 2021. Plaintiff has stated that it was the responsibility of defendants to find medical care, not the plaintiff's. As defendants' expert hand surgeon, Dr. Eric George points out, much of plaintiff's current hand problems are due to his inability to move certain fingers. This is a result of plaintiff's failure to do home exercises as prescribed by his doctors in New Zealand. After the accident, defendants retained Future Care, Inc. (Dr. Eric Rivas) to assist plaintiff in setting up medical care in the Philippines. However, plaintiff rebuffed the attempts of Future Care, Inc. to help him and chose to not seek medical care. Within two months after the accident, plaintiff retained counsel and filed suit. His attorneys set him up with a hand specialist in Lafayette, Louisiana who made recommendations for treatment of plaintiff's hand. This occurred over a year ago and still

Minckler has not even undergone the medical treatment recommended by his own expert to improve the function of his hand. We think the jury is not going to be impressed by the plaintiff doing nothing to improve his medical condition and failing to mitigate his damages.

### 4. Medical

While plaintiff had a serious injury to his left hand, it could have been worse. The plaintiff sustained lacerations of the hand and a fourth metacarpal head fracture. There was no apparent ligament or nerve damage. Although plaintiff states that he underwent five surgeries, only one of the five was to repair the fourth metacarpal fracture. The remainder of the surgeries were to debride and clean the wound to avoid infection.

### 5. Plaintiff's Return to Work

Plaintiff's aforementioned medical expert, Dr. Darryl Henderson, has issued a report stating that plaintiff needs to have two fingers amputated and cannot return to his job as a Bosun. Dr. Eric George, noted hand surgeon in New Orleans, disagrees. As discussed above, most of what Minckler is experiencing with his hand is due to lack of exercise and lack of medical care which Dr. George says can be repaired with minimal surgery and physical therapy. Dr. George points out that, if Minckler participates in physical therapy, he may very well be able to return to work as a Bosun which would obviously negatively affect his claim for future wage losses.

### 6. Plaintiff's Average Annual Salary

Plaintiff's expert economist, Dr. Randy Rice, states in his report that plaintiff's average annual salary at the time of his accident was approximately $109,000. Dr. Rice states that plaintiff's counsel provided this figure to him. The $109,000 figure is way too high. First of all, we are unable to document plaintiff's annual average wage because there are no records to

establish that amount. Plaintiff admits that he has not filed U.S. income taxes in ten years even though he admits that he had an obligation to do so. This will, we believe, negatively affect the jury's opinion of plaintiff. Defendants have attempted to calculate plaintiff's annual average wage by taking his deposition testimony to the effect that he worked 6-8 months out of the year, and spent the rest of the year with his family. Defendants calculate his earnings, based on W-2's from defendants, as closer to $60,000/per year, which drastically reduces plaintiff's projected wage losses as contained in Dr. Rice's report.

### 7. **Plaintiff's PTSD Diagnosis is Unreliable**

Plaintiff's expert psychologist has diagnosed plaintiff as having PTSD caused by the accident in question. This diagnosis was essentially made by the psychologist speaking to plaintiff over the phone. Defendants' neuropsychologist states that this methodology (talking to a patient over the phone) is improper for diagnosing PTSD. A diagnosis must be made through neuropsychiatric testing and face to face interviews -- none of which have been done in this case. It should be noted that plaintiff's expert hand surgeon arrived at his diagnosis the same way -- by speaking to plaintiff by phone, also improper methodology.

### 8. **There is No Claim for Additional Maintenance and Cure**

Defendants have paid plaintiff maintenance at the rate of $20/per day since the accident. Defendants have also paid all of plaintiff's medical bills presented to them. Plaintiff has complained that the $20/per day maintenance rate is too low. However, the rate was negotiated by plaintiff's union and therefore is valid and defendants have no obligation to adjust a rate negotiated by plaintiff's union. There is no claim for additional maintenance and cure.

Respectfully submitted

*/s/ T. Patrick Baynham*
T. PATRICK BAYNHAM (16805)
HANSFORD P. WOGAN (34825)
SARA B. KUEBEL (38305)
Jones Walker LLP
201 St. Charles Avenue, Suite 5100
New Orleans, Louisiana  7017-5100
Telephone:   (504) 582-8323
Facsimile:    (504) 589-8323
E-Mail:        tpbaynham@joneswalker.com
                     fwogan@joneswalker.com
                     skuebel@joneswalker.com
Attorneys for Defendants,
Waterman Steamship Corporation and
Seabulk Fleet Management, LLC

## **CERTIFICATE OF SERVICE**

I hereby certify that on this 28th day of February, 2022 a copy of the above and foregoing has been forwarded to all parties and counsel of record via the Court's ECF filing system, US Mail, email and/or facsimile.

*/s/ T. Patrick Baynham*
T. PATRICK BAYNHAM